## William Dow v. The State.

### No. 29. Decided November 19.

**1. Continuance — Threats Immaterial, when.**—Where an application for a continuance was to prove by the absent witness that deceased cursed and abused defendant, and stated that he intended to "wear out" the defendant, *held*, under the facts of the case, as adduced in evidence, which showed that defendant sought the deceased and brought on the difficulty which resulted in the homicide, that such testimony was immaterial and not probably true, and that the continuance was therefore properly refused.

**2. Jury—Talesmen—Service of List of.**—A defendant is not entitled to service of a list of talesmen summoned to complete the jury.

**3. Practice—Disagreement of Jury.**—On a murder trial, where the jury, after the case had been submitted to them, returned into court and stated to the court that they had not and could not agree upon a verdict, as to "the degree" (of murder), and the court ordered them to return to their room and further try to reconcile their differences and agree upon a verdict; that he did not wish to coerce them, but that it was the interest of society that they should, if they could, agree upon a verdict; *held*, that the action of the court was correct, and that such action could not possibly be construed into an intimation to find adversely to defendant.

**4. Murder of the Second Degree.**—See a state of facts which the court holds would have warranted and justified a verdict of a higher degree of offense than murder in the second degree.

Appeal from the District Court of Palo Pinto. Tried below before Hon. C. K. Bell.

Appellant was indicted for the murder of one Z. H. A. Perkins, and he appeals from a judgment of conviction for murder in the second degree, with the punishment affixed at thirty-five years in the penitentiary. The evidence is, in substance, as follows:

John Perkins, for the State: Am the son of Z. H. A. Perkins, who died in Palo Pinto County on the 13th day of June, 1891, from a gunshot wound in and near the left eye. Know the defendant, William Dow. On the day of my father's death, we lived on defendant's place, and were his tenants at that time. On that day we had finished hoeing cotton, and had gone over near the fence and were hoeing out a melon patch, which was about 50 yards wide, and was between the oats and corn on one side and the fence on the other, about 150 yards from the house. When we were near where the oats and corn join, about ten steps from the corner, heard defendant speak, and looking up, saw him standing at the corner, and looked like he had just stepped out of the corn. He said to my father, Z. H. A. Perkins, "Now, durn you, we will settle it." My father said, "You have got your gun; give me a chance." Defendant had a double barreled shot gun, and when my father said that, he raised his gun and shot my father down. I was eight or ten steps away; my brother, Avery

Perkins, was a little nearer; my brother Judge was stepping out of the corn. After shooting father, defendant immediately turned his gun in the direction of my brother, and said, "I will shoot you, too, Judge." I ran between them, and as defendant turned his gun upon me, I dodged down, and he shot me in the back, near the top of my shoulders. When defendant shot me, my brother Judge came up and struck him with a pole. Defendant caught the pole with his left hand and pushed, or knocked, my brother down. He then came towards me, and my brother got up behind defendant and knocked defendant down. As defendant got up he was knocked down again; think I knocked him down the second time. I broke my hoe off from the handle over his head. He was knocked down two or three times, and maybe more. About this time mother came running up to where father was and called me, and we quit striking defendant and went to her. Defendant's wife also came up, and defendant went off with her towards his house.

Father was stooping over hoeing a hill of watermelons when defendant first spoke to him. When he raised up, he pushed up his hat; was holding the handle of his hoe in his right hand near the hill of melons, when he was shot. He had a habit of pushing up his hat when he would stop to talk to any one, especially if it was warm weather.

About three-quarters of an hour before this, defendant was going up into the field to get a horse, and as he came by where we were hoeing, father called to him and told him that he (father) would want some good, sharp plows to go plowing Monday. Defendant said, "all right," he would have them ready. The conversation seemed perfectly friendly. Father then said, "Last Saturday you said my darned little shits ruined your rasp, and this Saturday I say for you to keep *your* honies from tearing my corn shoots." Defendant said, "I did not say they ruined it, but that they would ruin it." Father said, "Oh! yes; I thought you would lie out of it." This was the last I saw of defendant until the shooting. Father died in two or three hours after he was shot, in Palo Pinto County, Texas, June 13, 1891.

Cross-examined: Defendant said, "Now, durn you, we will settle it." Father said, "You have your gun; give me a chance." Defendant said something about a pistol; think he said, "Last Saturday you carried a pistol for me." Father said, "You are a liar," and as he said that defendant shot him. I think it was as defendant came back from looking for his horse, that father told him what he did about his children pulling the corn shoots. On the Saturday before, father and I went to measure the land we had cleared for defendant. Father asked the defendant to go, and he refused. Neither my father nor any of us had a pistol. There was no shooting by any one that day.

Judge Perkins testified substantially about the killing as did the previous witness. This witness stated: When I saw defendant turn his

gun on my father, and about the time he shot, I picked up a pole about seven feet long, that had been used for a stake to lay off corn rows, and running as fast as I could toward defendant, said, "Damn you, I will kill you." After he shot father, he turned his gun on me, when brother John ran with his hoe, and defendant shot him. I ran up and struck at defendant, when he threw up his hand and caught the pole and knocked me down, and ran over me towards John. I got up and knocked him down, and as he got up, knocked him down two or three times. John was also striking defendant, and I think my brother Avery struck him. Then mother and defendant's wife came up, and as defendant went off with his wife, said, "I will shoot you too, Judge."

Witness here pointed out, on a diagram, which he said was correct, the relative position of the parties engaged in the difficulty, and the position of the various objects of interest connected with the scene of the homicide. Witness' testimony was similar to that of his brother, as to what occurred on the day that they measured the land. He denied that there was any swearing on that occasion, at the defendant, or in the presence of his family. Witness denied having told Thomas Hammons, on the day of the killing, that defendant came up through the corn, and pointed the gun first at his father, and then at him, and that I told defendant that if he shot my father, God damn him, I would kill him, and that I picked up a pole and was running onto defendant when he shot my father. Witness stated, that on the day of the killing, and at the place of killing, he did show Hammons where the parties stood. Where he, himself, was when he first saw the fight, and when he first picked up the pole. Told him the first I saw of the defendant he was standing in the edge of the corn and oats, where they made a corner, and that he looked as if he had just stepped out of the corn. I am 20 years old, brother John 16, and Avery 12.

Avery Perkins testified substantially as did the other two witnesses to all the facts deposed by them, and to nothing else of any importance.

It is unnecessary to give the testimony in detail of Mrs. Perkins, who was the next witness, as she only testified to having heard the shots, went out, saw her sons and defendant fighting, and that as she went by she saw Mrs. Dow, the wife of defendant, in her house, in the dining room, midway between the stove and table. That when she reached the spot she found her husband shot. That he was unconscious and never spoke. That they carried him to the house, where he died after an hour or so.

Mrs. Ara Driggers testified: That she was Ara Perkins at the time of the difficulty, and was at home with her mother. Her testimony is substantially the same as her mother, Mrs. Perkins, and in addition, that when she heard the gunshots she went to the door of her mother's house, and saw Mrs. Dow, wife of defendant, in her (Mrs. Dow's) dining room.

That when she left her mother's house she saw Mrs. Dow leave her house about the same time.

Clark Twitchell, the constable, testified to nothing except to the examination of some tracks found near the scene of the homicide. And the same may be said of the testimony of T. T. Bouldin, W. J. Crayton, and C. L. Walker.

S. S. Polk testified, that on the Saturday before the killing, deceased and defendant had some words in the field.

A. J. Hopewell: Knew defendant and deceased. On the Thursday before the killing on Saturday, had a talk with deceased, and then went to see defendant. Defendant asked what deceased had to say. Told him that deceased had said that he (deceased) wanted to leave his and defendant's differences to two disinterested men, one selected by him and one by defendant, and a third to be selected by these two men, to arbitrate the matter. Defendant either said, " Darn his old soul, I wont do it; I'll settle my own differences;" or, " I'll do no such darned thing; I'll settle my own business."

J. A. Tullis testified, that the night of the killing he was at defendant's house and asked him why he had killed deceased, and he said, " I was aggravated into it."

J. H. Baker testified to a conversation with defendant, about a week before the killing, which showed bad feeling on his part toward the deceased.

Dr. Johnson: Was a practicing physician, and called to see deceased after he was shot. Described the wounds, and stated that there were no powder burns on deceased. Also examined and dressed the wounds on John Perkins, which he described, and stated that there was no powder burn on them. Shortly after, was called to see defendant; he was suffering from two scalp wounds, made from some instrument that would cut. He also had several bruises on his arms and body. The wounds on the head were not very serious, but were sufficient to produce considerable pain. Defendant was also suffering from concussion of the brain, caused from these wounds.

Miss Nora Hammons testified to seeing the defendant get some gun cartridges out of a sock the day of the homicide.

Mrs. Tom Hammons, mother of Nora, testified to the same fact, and that defendant said he wanted to borrow the gun to shoot a sapsucker. About twenty minutes after, she heard of the shooting.

Here the State's testimony closed.

Inasmuch as defendant testified in his own behalf, and his testimony develops his side of the case and the defense, it is here reproduced, as follows:

William Dow, sworn in his own behalf, testified as follows: I am the defendant in this case. P. H. McMillan made arrangements with me to

have deceased come from Georgia in the spring or winter of 1891, and for him (deceased) to rent land from me. Deceased came. He agreed to cultivate the "eight" acres of land I had, and put in another piece of land that I had to clear. There was, I think, about 35 acres in the piece to be cleared. When deceased began work, I tried to get him to agree on a price for the clearing, urging him to do so for the reason that he and I were strangers. He said he was a stranger in the country, and did not know what such work was worth, and that he would leave it to me. I afterward tried again to get him to set a price on the work, but he persisted in leaving it to me, stating at the same time that he knew I would do right in the matter.

He had gotten most of the land grubbed, when one day he came to me and said he did not have land enough for himself and family, and asked me if I had any objection to his working 14 acres of land in Hammons' field near by. I told him that I thought he had about as much as he could say grace over, and that he was a stranger in the country, and that no man wanted to furnish another a house to live in while they worked some one else's land. It was agreed in the beginning that I was to furnish deceased team, tools, etc., and was to pay him in the fall for the work of clearing the land. After the talk about renting the Hammons land, deceased got mad and wanted his money for the clearing. I told him that he could not get it till the fall of the year come, and until I gathered my part of the crop, for that was our contract. He demanded a settlement at once. I told him all I wanted him to do was to stick to his contract.

The quarrel in the field that Mr. Hammons heard, was over a settlement. I went up to where deceased was to take a doubletree, and deceased commenced on me about a settlement, and he said he was going to have his money, and that he was going to have it right away. I told him that was not our understanding in the beginning; he talked very abusive and I left him.

Deceased got mad with me also because I did not want him to work my horses all the week and then let his boys run them over the country on Sunday. I told him I did not care for him taking the horses any Sunday and carrying his family to church, but that I did not think it right to work the poor horses all week and have his boys run them over the country on Sunday. He got mad at this, and would not take care of the horses on Sunday, and I had it to do.

On the Saturday before the killing, the boys got my new rasp, that I had given a dollar for, and filed their hoes with it. I went to Judge and asked him, in a friendly way, not to let the boys ruin my rasp, and told him that I would file the boys' hoes for them any time they would bring them around. Judge seemed to take offense, and would not make me any answer, so I thought I would go and tell Mr. Perkins about it. I

went to him and told him, in a kind, friendly way, to not let his boys file their hoes with my rasp, as it would not do to put on a horse's foot after it had been used for filing hoes. I told him any time the boys wanted their hoes filed, to bring them in and I would file them for him. He flew into a passion and said, "Damn it, lay it out and I will pay for it." I *told* "No, Mr. Perkins, do not get mad. I do not want you to pay for it; I only wished you to tell the boys not to do so again." He said, "Yes, I'll be damned if I don't pay for it." I *told* no, but he still said he'd be damned if he didn't, and went off toward the house. In a few minutes he came back, and said, "Here is a dollar to pay for that rasp; now hand it out here." I told him again, "Mr. Perkins, don't get in a passion; I don't want you to pay me for that rasp." He said he would be damned if I did not have to take it. I said that if nothing else would do him I would take it. I gave him the rasp, and he laid down the dollar, and as he went out he said, "If you don't let me and my boys alone, I will kick your God damned ass." I said, "Mr. Perkins, go on away; I do not want you here."

That evening deceased came back, and had his ax, and said, "God damn you, go with me to measure that land." I told him I knew how much there was of the land, and that there was no use for me to go with him. He stuck his ax down in the ground near me. I did not go with him, but took my little girl and went into the house. He and his boys went on and measured the land, I suppose; I heard them shoot as they went up through the corn. After awhile I heard another pistol shot up where they were.

On the following Wednesday after this, and on Wednesday before the shooting, I started down to the little pasture near the deceased's house to get my horses. When I got near the deceased's house I saw him up the fence, a little way above the gate where I was going through, standing by the fence post. He had a shot gun. He stood there a minute, and then came down the fence toward the gate. I went back to my house and waited till he went into the house, and then I took two of my little children and went and got my horses. I took my children with me because I was afraid of deceased, and I did not think he would hurt me if I had my children with me.

On the day of the killing, I went down in the field to get my pony. I passed by where deceased and his sons were hoeing, in a melon patch. Deceased called to me, and said he wanted some sharp plows to plow cotton with Monday. I told him all right. We spoke in a friendly way. I went on and got the pony, and as I came back deceased said to me, "Last Saturday you said my damned little shits of children ruined your file; this Saturday, I say for you to keep your damned little shits out of my corn patch, and if you don't do it, I will make you do it." I said, "No, Mr. Perkins, I did not say that." He said, "Oh, yes, now, damn

you, I thought you would try to lie out of it.'' I then started off, and he called to me, and said, "Stop, I want to talk to you;'' but I did not stop. I went to the house, and then went and got my other horses, which were over in the pasture, and watered them, and then came back. I got to studying about the way Mr. Perkins was doing me, and so I thought I would go and see him, and if I could not get him to some kind of terms, I thought I would have him put under a peace bond; so I went. I had tried to get Hammons to go with me some days before, and he would not. I was afraid to go down to where they were without something to defend myself with, and so I thought I would go and get Mr. Hammons' gun, as I did not have any of my own. I knew that Mrs. Hammons knew that I had not been at peace with the Perkins family, and so, in order that I might not arouse her suspicions, and in order to be sure and get the gun, I told her I wanted the gun to shoot a sapsucker with. I feared she would not let me have it if I told her the real reason I wanted the gun. I did not intend to do any of the Perkinses any harm when I got the gun and started down in the field. I only thought I would go and have a talk with them, and try and come to some understanding of our differences.

I walked along down the edge of the oats, and then up between the corn and the oats, near where the difficulty occurred. I was in plain view of deceased and his sons from the time I left my house. They saw me coming and all stood and looked at me. I went up the edge of the corn and oats, to where they bordered on the melon patch, and said to Mr. Perkins, "Now, Mr. Perkins, I want you to stand back and let us talk this thing over. You have been carrying a pistol for me, and now I want us to have some understanding about this trouble.'' Mr. Perkins said, I was a liar, and raised his hoe, and started at me. I told him to stand back, and not to come on me with his hoe, but he kept coming, and the boys too. Mr. Perkins struck me with the hoe, and just as he struck me I fired the shot that killed Mr. Perkins. The boys then struck me and knocked me down, and I dropped my gun, and they knocked me down the second time. I finally got hold of the gun, and just about the time I got hold of it, it went off. I am not able to say how it went off. About that time my wife came up, and I went toward her, and they did not hit me any more. I went on to the house with my wife. That night the doctor came and dressed my wounds. I was bruised up all over, nearly. I had two or three wounds on the head, and some on the arms and back, and one on my side. As I went on to the house I feared the boys of deceased might still follow me and hurt me or kill me, and so I reloaded the gun. I was suffering great pain the night Dr. Johnson came and dressed my wounds. Mr. Westdridge was there at the same time.

Cross-examined, this witness said: In all the quarrels I ever had with deceased, he (deceased) provoked them. I always spoke kindly to him,

and he spoke to me in an abusive and insulting way. I never had any falling out or short words with the deceased until after he wanted to rent the lands of Hammons, and I told him he had all he could say grace over. After that we got along badly; he appeared mad, and called me Master Billy once after that. Deceased had three boys and a girl who worked in the field. A person can not see another from the front door of deceased's house to the kitchen door of my house; the peach trees are in the way. I am certain I am correct about this. I did not tell W. J. Creighton, on the night of the killing, at my house, that I had killed deceased because he, deceased, had cursed my children. I did not tell him, on that occasion, that he had cursed my children, and that I could not stand that, and that I had prayed to be delivered from what I had done. That I had prayed over it, but that deceased had cursed my children, and that was the reason I had killed him. I did not tell Mr. Westridge on the same occasion, and also J. O. Tullis, that I killed deceased because I was aggravated into it. When I shot deceased I was standing in the edge of the oats, and deceased was in the act of striking me with his hoe, and did strike me just as the gun fired. I am 49 years old, and weigh 155 pounds, and a blacksmith by trade.

T. H. Hammons, for defendant, testified about the differences between defendant and deceased about clearing the land, and efforts of the parties to arbitrate the matter. He also testified to being present at the blacksmith shop at the time of the difficulty between the parties about the file, and his statement corroborates the defendant as to that matter. He testified also that on the Thursday before the killing the defendant tried to get him to go with him to see deceased and talk with him about the matter, saying that he was afraid to go alone; which he declined to do. In several particulars this witness contradicted the testimony of the State's witnesses. He testified that a person from Perkins' house could not see into the house of Dow at the time of the difficulty, owing to the peach trees, which were in leaf, obstructing the view. He stated that he would swear a lie to save any of his family if they were in trouble, but that whilst he was a brother in the Masonic order with defendant, he would not vary one iota from the truth to save defendant, or any one but his own family.

Mrs. Dow, wife of the defendant, testified to previous troubles between defendant and her husband about the clearing of the land, and to threatening acts and words of deceased toward defendant. She testified that the first she knew of the difficulty was when she heard some loud talking and cursing in the field. That she looked out of the kitchen door and saw deceased and his two oldest boys and Mr. Dow engaged in a fight. Mr. Dow had a gun, and deceased and one of his boys had hoes, and one of the boys had a pole and was striking at Mr. Dow. That she started immediately to run up there as fast as she could, and just about the time

she started she heard a gun fire, and very soon a second one. She also stated that a person standing in the front door of Perkins' house could not have seen into her kitchen. Her testimony also as to what she knew and saw of the difficulty was impeached by contradictory statements made by her to Dr. Johnson and Mr. Wooldrich, who both testified that on the night after the killing they heard her say, the first she knew of the difficulty she heard the gun fire, and that she then went to the door and saw them fighting with hoes. She was also contradicted as to her statement that she had been abused and insulted by Perkins and his boys.

The defendant proved by a number of witnesses, who knew him before he moved from Falls County, and by several witnesses who knew him since he had lived in Palo Pinto County, that his reputation as a peaceable and law abiding citizen was good, though he was irascible and quarrelsome.

*J. S. Straughan* and *Albert Stevenson*, for appellant.—1. If the defendant's application for a second continuance was in compliance with the statute, if the testimony of the absent witness, E. D. Cook, was material and probably true, and due diligence had been exercised to obtain his testimony on the trial, the application for continuance should have been granted; and the application for continuance having been overruled, a new trial should have been granted, to obtain the testimony of the witness. Willson's Crim. Proc., article 555, and note 2186, and cases there cited; Jackson v. The State, 23 Texas Ct. App., 183; Covey v. The State, 23 Texas Ct. App., 388; Mayfield v. The State, 23 Texas Ct. App., 645; Harris v. The State, 18 Texas Ct. App., 287; Irvine v. The State, 20 Texas Ct. App., 12; Aiken v. The State, 10 Texas Ct. App., 610.

2. Defendant was entitled to a list of all the talesmen summoned upon whom he was required to pass as jurors in the trial of his case.

As to care and particularity in manner of drawing special venire: Willson's Crim. Proc., art. 610. As to same in selecting jury from special venire: Code Crim. Proc., art. 640; Osborne v. The State, 23 Texas Ct. App., 431. Appellant demanded, at the time, a list of all the talesmen summoned, and excepted to the refusal of the court at the time it occurred, and exhausted his challenges. Gardenhire v. The State, 6 Texas Ct. App., 150.

3. It was error to charge the jury, "that if the defendant sought and brought on the conflict with the deceased, and if in such conflict he killed the deceased, he would not be justified in such killing," without reference to what the intention of the defendant was in bringing on the conflict, or in going to the place where the deceased was, with a gun. Willson's Crim. Stats., art. 981; Hollis v. The State, 8 Texas Ct. App., 620; Green v. The State, 12 Texas Ct. App., 445; King v. The State, 13 Texas Ct. App., 277; Smith v. The State, 15 Texas Ct. App., 338; Cunning-

ham v. The State, 17 Texas Ct. App., 89; Cartwright v. The State, 14 Texas Ct. App., 486; Horrigan and Thompson on Self-Defense.

The court erred, in that when the jury returned into court, and through their foreman reported to the court that they could not agree upon the offense of which the defendant was guilty, in instructing the jury verbally, in substance, that it was to the interest of society that they should reconcile their differences if they could, and agree upon a verdict.

Reversible error to charge jury verbally, when promptly excepted to. Code Crim. Proc., arts. 682–85. Without inquiry as to effect of such error on the jury. Willson's Code Crim. Proc., note 2363; 40 Texas, 200; 24 Texas Ct. App., 80. The court can only give additional instructions at the request of the jury, and in writing, and must not invade the province of the jury. Willson's Code Crim. Proc., art. 696, note 2383; 7 Texas Ct. App., 610; 11 Texas Ct. App., 390.

*R. H. Harrison*, Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of thirty-five years.

A second continuance was sought, for the testimony of alleged absent witnesses, all of whom appeared at the trial except E. D. Cook, by whom defendant expected to prove that deceased cursed and abused him, and stated that he intended to "wear out" the defendant. Under the facts of this case, the evidence was not material. It was not a threat against the life of defendant, nor was it probably true, when viewed in the light of the record before us. The defendant sought the deceased, and brought on the difficulty which resulted in the homicide. Defendant testified, but did not allude either to the alleged absent witness or the testimony.

The special venire having been exhausted, talesmen were summoned. "The defendant was furnished with a list of a part only of the talesmen summoned." The jury was completed from this list so furnished the defendant. He requested, but was refused, a list of the remaining talesmen. He reserved his bill of exceptions, and assigns the ruling of the court as error. The defendant is not entitled to service of a list of talesmen summoned, and, besides, the jury was completed from the list of talesmen furnished him. Johnson v. The State, 4 Texas Ct. App., 268; Drake v. The State, 5 Texas Ct. App., 649; Harris v. The State, 6 Texas Ct. App., 97; Gardenhire v. The State, Id., 147; Sharp v. The State, Id., 650; Richardson v. The State, 7 Texas Ct. App., 486.

After their retirement, and before they had agreed upon a verdict, the jury returned into court, and stated to the court that they had not agreed, and could not agree. In answer to the inquiries from the court, the jury stated they fully understood the charge, but "could not agree upon the

degree." The court then stated to them, "I have no desire to attempt to coerce you into a verdict. That is a matter for each of you to determine for himself; but it is to the interest of society that you should reconcile your differences, if you can, and agree upon a verdict; and I do not feel authorized to discharge you. You will return to your room, and if you can reconcile your differences and agree upon a verdict, I hope you will do so." This action of the court was objected to, because "it was calculated to cause them to agree when they would not otherwise have agreed, and thus indirectly influence the jury, and to cause some of them to surrender their convictions as to the degree of the offense of which they should find the defendant was guilty in order to reach a verdict, and to render a compromise verdict in order to reach a verdict at all." It is a practice familiar to the courts and the profession for the juries to retire to their rooms for further consideration of the case where they have announced their inability to agree, with the injunction that they must reach a verdict, even if they should be kept together until the end of the term. It would hardly be contended this practice was subversive of the rights of a defendant, or that it was even calculated to extort an unjust verdict, or impair his guaranteed right to a fair and impartial trial. The courts are inhibited from discharging the jury in such cases without the consent of the defendant, except under the peculiar circumstances provided by the statute, and in such cases the jury may be held together until the final adjournment of court. Code Crim. Proc., arts. 701, 702; Powell v. The State, 17 Texas Ct. App., 345; Schindler v. The State, 17 Texas Ct. App., 408; Varnes v. The State, 20 Texas Ct. App., 107; Pizano v. The State, 20 Texas Ct. App., 139; Brady v. The State, 21 Texas Ct. App., 659; Rudder v. The State, 29 Texas Ct. App., 262.

It is manifest from the bill of exceptions that the guilt of the defendant had been fully determined by the jury; the unsettled question being the degree of murder of which he should be convicted. The language of the court did not convey to the jury any intimation as to what their verdict should be, but expressly informed them that they must each for himself determine his verdict, and that he had no desire or intention to coerce them into a verdict of any character. We do not see how the language attributed to the court could be construed into an intimation to find adversely to the defendant, or how he has been prejudiced by it. The object of all trials in court is to reach a verdict, and a final disposition of the case.

The fact that the conviction was for the inferior degree would indicate strongly that he was not injured, and it has not been made to appear that he has been prejudiced by this action of the court. Especially is this so when viewed in the light of the evidence before us. As disclosed to us, the testimony warranted and would have justified a verdict for a higher degree of the offense.

The charge fully submits the law of the case, and favorably to the defendant. The objections sought to be urged against it are not tenable. Finding no error in the conviction, the judgment is affirmed.

*Affirmed.*

Judges all present and concurring.