### J. P. Rippetoe v. The State.

No. 1770. Decided May 22, 1912.

Rehearing denied June 19, 1912.

**1.—Murder—Evidence—Continuance—Bill of Exceptions.**

In the absence of a bill of exceptions to the overruling of a motion for continuance, the admission of testimony and a specific objection to the charge of the court, the same can not be considered on appeal.

**2.—Same—Charge of Court—General Objection—Bill of Exceptions.**

Where no error is pointed out in the charge of the court the bill of exceptions is insufficient. Following Quintana v. State, 29 Texas Crim. App., 454.

**3.—Same—Remarks by Judge—Weight of Testimony.**

Where, upon trial of murder, the jury announced that they could not agree and asked to be discharged, whereupon the court remarked to them that the case had to be settled by some twelve men; that he did not know of any twelve men who could do better than they could; that he thought they could settle it and ought to settle it and that the court wanted it settled; that the court would adjourn on the night of the next day but he could hold it in session till the business in hand was disposed of, there was no reversible error; there being nothing in the court's statement which could be construed as an opinion on the merits of the case.

**4.—Same—Sufficiency of the Evidence.**

Where, upon trial for murder, the defendant was convicted of manslaughter which was sustained by the evidence, there was no reversible error.

Appeal from the District Court of Foard. Tried below before the Hon. S. P. Huff.

Appeal from a conviction of manslaughter; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*J. L. Lackey, H. A. Allen* and *R. E. Taylor,* for appellant.—On the question of the court's remarks to the jury: Kelly v. State, 33 Texas Crim. Rep., 31; Simmons v. State, 55 id., 441; Conn v. State, 11 Texas Crim. App., 390.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, JUDGE.—Appellant was indicted by the grand jury of Collingsworth County, charged with the offense of murder. The venue was changed to Foard County, and when tried he was found guilty of manslaughter and his punishment assessed at five years imprisonment in the penitentiary.

The facts would show that a petition was being gotten up to open a road along the line of a pasture leased by deceased, Earnest Gayden and another, and the appellant was interested in getting the road opened while deceased was opposing it. Some feeling grew out of the matter, and on the evening before the killing deceased, learning that appellant had gone to the town of Wellington, he asked Loter to go with him ·to town to see appellant. It appears that deceased had told Loter something in regard to the theft of some yearlings that appellant was alleged to have said in regard to Loter. When deceased and Loter arrived in Wellington they went into a store where they saw appellant, and getting in there some words passed between appellant and deceased, when deceased grabbed or grabbed at appellant's collar. The storekeeper told them they could not fight in there, but told them there was an eighty foot street in front or a back lot behind the store. Appellant and deceased went to the rear of the store, where more angry words were passed, when appellant told deceased he was not armed and was not able to fight him, it appearing that deceased was a much stronger and some larger man than appellant. .Deceased told appellant to go and arm himself, and appellant left and tried to borrow a weapon, but failing, he went home. They did not meet any more that afternoon, but Loter, Lem Bartlett and deceased later, also went home, and Loter and Bartlett say that after talking with deceased he agreed to drop the matter, and Bartlett says he told appellant that evening "that Earnest (deceased) said he did not intend to mention it any more, and was going to treat him all right, and was going to be friendly with him and drop the matter." That appellant replied, "That is more than I can say for Earnest."

J. W. Singley and Bob Armstrong say that the next morning they and deceased started to Ed Small's to go wolf hunting, having with them six or seven stag hounds, or wolf hounds. That deceased had on no coat, but had what is known as a jumper. That he had no arms of any kind; that in going to Small's they would pass right down by appellant's fence, and they saw appellant inside of the enclosure

leading his horse and apparently fixing his fence. Singley then depicts the scene of the killing as follows:

"At the time we three rode by the place where the defendant was, Armstrong was the closest one of us to the fence, and he was the nearest one of us to the defendant Rippetoe. I think I was next to Armstrong, riding in the middle, and Gayden was on next to me. We three were riding abreast, and I think that is the way we were, but I am not positive as to that.

"When we three got up even with the defendant, Rippetoe, the defendant, said, 'Good morning, Mr. Singley, good morning, Mr. Armstrong.' He did not say anything to Gayden. Armstrong and I both replied to that by saying, 'Good morning, Rippetoe.' Nothing else was said by us at that time. After that Gayden said 'Good morning,' and Rippetoe replied, 'Good morning.' Then Rippetoe said, 'What about our little trouble,' and Gayden said, 'What trouble,' and Rippetoe replied, 'Our trouble of yesterday and before.'

"At the time this conversation was had Rippetoe was right over inside of his gate, and I think we were a little north of him, maybe five or six feet north of him at that time. I know I sorter turned my horse around. At the time we first spoke to him we were about even with him, and we continued to ride on north; and at the time he spoke to Gayden about that 'little trouble' we three were continuing to ride on north down the road. After the remark was made by Rippetoe, the defendant, about the trouble of yesterday and the day before, Gayden got down, or rather he just pulled back his horse, turned his horse back around, and I kinder turned my horse, and then Gayden got down off his horse. At the time Gayden got down off his horse I suppose he was about twelve feet from the defendant, Rippetoe, and Rippetoe was about east of Gayden at that time. As nearly as I could guess it they were twelve feet apart at that time. Rippetoe was on the east side of the fence, and Gayden was on the west side of the fence, Gayden being out in the road. Gayden said for Rippetoe to come out there in the road if he wanted to settle anything, and Rippetoe said, 'I won't do it.' Rippetoe then said, 'Get your gun. I have got mine.' Gayden replied, 'I have got no gun.' Gayden had on a ducking jumper, and he pulled it up this way (witness indicates how Gayden did), and then he turned around this way (indicates how Gayden turned) and said, 'See, I have not got a gun.' When Gayden turned around that way he stopped right still, and stood there. Gayden was over this way (indicating where Gayden was standing), and Rippetoe sorter turned around to his right, and made a couple of short steps, and I seen him pull something out, and as well as I remember he pulled it out with both hands—pulled it up sorter with both hands. It was a gun he pulled up, that is a pistol. Rippetoe then cocked the pistol and took aim, and then pushed it out like this (witness indicates with his hands that the defendant pushed the gun forward)—pushed it towards Gayden; looked like it shook a little, and immediately fired

Gayden then turned and ran right north, the way we were going. While Gayden was running Rippetoe had the gun and he aimed it and shot again, that is cocked it and shot again. . . .

"The morning of the shooting Earnest Gayden, the deceased, had on a 'round-about,' a sort of jumper over his undershirt. Immediately before the first shot was fired the deceased, Gayden, was standing right still. He was in plain view of me, and I could see him plainly. Earnest Gayden did not have a gun that morning." Bob Armstrong corroborates Singley in all material particulars.

Defendant says: "They rode up tolerable close to me, and I spoke to Mr. Singley and Mr. Armstrong, saying 'good morning' to them and calling their names. Mr. Gayden then said, 'Good morning, Mr. Rippetoe,' and I said, 'Good morning, Earnest.' Then Gayden said, 'How do you feel this morning,' and I said, 'I feel all right.' Then Gayden said, 'Do you feel lucky,'—he spoke that in a loud tone of voice. I then said, 'What about our little trouble,' and he said, 'What trouble,' and I said, 'Our little trouble of yesterday and before.'

"Gayden did not say a word then, but he just jumped off his horse, and said, 'Come out here and we will settle it,' and he run around his horse—behind his horse—jumped off the left side of his horse and run behind it, and when he said that I said, 'I don't want to.' Then he said, 'Come on out here; now is as good a time to settle it as any.' He got around into the road, or nearly in the road when he said that. He was talking fast and quick, and I do not remember of him doing anything right then. I said to him, 'You said for me to go and get my gun; I have got mine;' and then he said, 'God damn you, shoot, I have no gun,' and made a motion with his right hand. He started down by his side with his right hand, and I jerked my gun and shot as quick as I could."

On cross-examination he admitted that on the examining trial he testified: "When they rode up there I was squatting down on the southwest corner near the gatepost, and facing that string of fence running east and west. That was my mother's string of fence that run east and west. Mr. Gayden had gotten down off his horse when he asked me 'what trouble,' and I referred him to it, and he said for me to come out in the road and settle it, and I said, 'I won't do it.' He said, 'Come out in the road and we will settle it,' and I said, 'You told me to go and get my gun, and I have got it now.' I believe that when I made that statement to Gayden he said, 'I have got no gun.'"

1. There are no bills of exception in the record in regard to the introduction of testimony, therefore, we can not consider the grounds in the motion relating to these matters, and neither can we consider the ground complaining of the action of the court in overruling the application for a continuance, there being no bill of exceptions reserved, and no such motion in the record. Neither can we consider grounds Nos. 14 to 29 inclusive, they reading: Because the court erred in the sixth paragraph of his main charge to the jury," each paragraph

reciting the same words but giving a different numbered paragraph of the charge. No error is pointed out, and the exception is too general to be considered. (Quintana v. State, 29 Texas Crim. App., 454.)

2. There is only one bill of exceptions in the record, and by that it is made to appear that after the jury had retired and deliberated for about twenty-four hours, the jury came into court and announced that they could not agree upon a verdict and asked to be discharged. The court then remarked, or rather said to the jury: "Gentlemen of the jury, this case has to be settled by some twelve men. I do not know of any twelve men who can do better than you can. I think you can settle it, and you ought to settle it. I want it to be settled. This court adjourns by law tomorrow night but I can hold it in session till the business in hand is disposed of. You will retire and consider of your verdict." To this action of the court the appellant excepted, alleging that same was highly prejudicial to defendant and was calculated to coerce a verdict, from the jury against defendant, and was a threat on the part of the court to punish the jury by keeping them together if they did not return a verdict in the case, the bill reciting that this took place about six o'clock one day, and the jury returned a verdict at the noon hour the next day, it being the last day of court.

Appellant in his brief cites us to a number of cases criticising the court for making remarks in the presence or hearing of the jury during the trial that were upon the weight to be given the testimony, and which correctly state the law as applicable to the facts in those cases, but the only case cited which seems to have any bearing on the question here raised is the case of Kelly v. State, 33 Texas Crim. Rep., 31, in which the court said: "It is true, the court never intimated its opinion regarding any one fact in the case, but the trouble is its remarks tended to sway away the defense in bulk." If the remarks in this case tended to take away any right of appellant, or if the language could be construed into an expression of the court as an opinion on the merits of the case, we would not hesitate to pronounce it error. But in the language used the court is careful to say anything that would indicate what opinion, if any, he had on the merits of the case. It is true he tells them he wants them to settle it, and they ought to settle it, but there is no intimation of how they should settle it—whether they should acquit or should convict appellant. In the case of Dow v. State, 31 Texas Crim. Rep., 288, this court, speaking through Presiding Judge Davidson, said: "It is a practice familiar to the courts and the profession for the juries to retire to their rooms for further consideration of the case where they have announced their inability to agree, with the injunction that they must reach a verdict, even if they should be kept together until the end of the term. It would hardly be contended this practice was subversive of the rights of a defendant, or that it was even calculated to extort an unjust verdict, or impair his guaranteed right to a fair and impartial trial. The courts are inhibited from discharging the jury in such cases without the consent of the defend·

ant, except under the peculiar circumstances provided by the statute, and in such cases the jury may be held together until the final adjournment of court."

And in the case of Carlisle v. State, 56 S. W. Rep., 366, this court held: "After the jury had considered their verdict about forty-eight hours, they wrote the court a note, in which they stated it was impossible for them to agree, and asked to be discharged. The court had the jury brought in, and asked them whether it was a question of law or fact they could not agree upon; if it was a question of law, the court could aid them. They told the court it was a question of fact, and then the court said 'that he regarded them as honest men and intelligent, but they should endeavor to agree on a verdict, and he could not grant their request;' to which appellant excepted, because of the remarks of the court to the jury in the Newton case, in the presence of this jury, that he was going to put a stop to hung juries, and force them to agree. We do not think the statement of the court was calculated to prejudice the rights of appellant, nor is the statement such as indicated in the least how the court desired the jury to decide the case, nor is there any effort to show the court endeavored to coerce the jury."

We do not think the remarks of the court can be held to have been prejudicial to appellant, and it is the duty of the court to keep the jury together so long as there is a reasonable chance for them to arrive at a verdict.

The evidence in this case amply supports the verdict of the jury, and there being no error pointed out in the motion for new trial, the judgment is affirmed.

*Affirmed.*

[Rehearing denied June 19, 1912.—Reporter.]