### John Reed v. The State.

#### No. 3149.   Decided June 10, 1914.

#### Rehearing denied June 26, 1914.

**1.—Murder—Remarks by Judge—Practice in District Court.**

Where, upon trial of murder, the court, at the time he administered the oath to the regular panel of the jury, then addressed them orally in a general

way as to their duties in the trial of cases, at some length, to all of which defendant's attorney objected at the time for various reasons, and seven jurors of said panel were afterwards taken on the jury who tried defendant, but the defendant at the time his case was called and after said address by the judge made no voir dire or other examination of the said jurors, and it was not shown that any objectionable juror was forced on him, and the jury was charged in his case by written instructions from the court that they would be governed by the charge then given to them, there was no reversible error. Davidson, Judge, dissenting.

### 2.—Same—Jury and Jury Law.

There is no law that requires a trial judge when a jury is to be empaneled in a felony case, not capital, to summon other jurors when there are more than twelve in the panel to select from.

### 3.—Same—Evidence—Leading Questions.

Where the bill of exceptions, as accepted, recited that the court exercised his discretion in permitting the question, there was no error. Following Carter v. State, 59 Texas Crim. Rep., 73.

### 4.—Same—Evidence—Declarations of Defendant.

Upon trial of murder, there was no error in admitting in evidence the previous threat of defendant that he could whip the damned son-of-a-bitch who killed his dog.

### 5.—Same—Provoking Difficulty—Mutual Combat—Charge of Court.

Where, upon trial of murder, the issues of provoking the difficulty and of mutual combat was raised by the evidence, and also whether defendant intended only to engage in an ordinary fight without intent to kill, and the court submitted these issues according to the opinion of this court in a former appeal, there was no reversible error; besides, the charge was favorable to defendant. Davidson, Judge, dissenting.

### 6.—Same—Sufficiency of the Evidence.

Where, upon trial of murder and a conviction thereof, the evidence sustained the conviction under a proper charge of the court, there was no reversible error.

Appeal from the District Court of Eastland. Tried below before the Hon. Thomas L. Blanton.

Appeal from a conviction of murder; penalty, ten years imprisonment in the penitentiary.

The opinion states the case.

*J. R. Stubblefield* and *D. G. Hunt,* for appellant.—On question of the court's address to the jury: Chapman v. State, 57 S. W. Rep., 965; Murphy v. State, 57 S. W. Rep., 967; Jones v. State, 51 S. W. Rep., 949; Attaway v. State, 55 S. W. Rep., 45; Bishop v. State, 72 Texas Crim. Rep., 1, 160 S. W. Rep., 705.

On question of the court's charge on provoking the difficulty: Red v. State, 39 Texas Crim. Rep., 414; Stringfellow v. State, 42 id., 588; Newton v. State, 58 Texas Crim. Rep., 316, 125 S. W. Rep., 908; Rogers v. State, 71 Texas Crim. Rep., 149, 159 S. W. Rep., 40; Robbins v. State, 70 Texas Crim. Rep., 52, 155 S. W. Rep., 936.

*C. E. Lane,* Assistant Attorney General, for the State.

PRENDERGAST, Presiding Judge.—Appellant was convicted of murder and his punishment assessed at eight years.

This is the second appeal in this case. In the first trial he was convicted of the same offense and his punishment assessed at ten years. The former appeal is reported in 72 Texas Crim. Rep., 1, 161 S. W. Rep., 97, from which a general idea of the case may be had.

Appellant and deceased were young men living in the same community. About a month before the homicide someone had killed appellant's dog. He believed deceased, or deceased's father had killed it. Not long before the homicide appellant met Mr. A. C. Brown, father of the deceased, at church, called him off to one side and asked him if he had killed his dog. Mr. Brown replied, "No, I have not killed anybody's dog." Appellant said, "I believe you killed my dog." Mr. Brown kept telling him that he had not. Then appellant said, "You or Oliver (deceased) one did, and I can whip the God damn son-of-a-bitch that done it." The parties then partially separated. Appellant repeated, at least three times, the last statement just above quoted, and at the time put, or had his hand, in his pocket.

Not long after this appellant, on horseback, met the deceased who was in a wagon in the public road. It appears that neither was seeking the other. The meeting occurred in just such a place as neighbors using the same road might meet at any time. Appellant testified that when he saw deceased and that they were going to meet, he dropped behind his two companions and as he met deceased he stopped and said to him, "Did you kill my dog?" He replied, "What have you got to say about it?" Appellant said, "It just takes a son-of-a-bitch to do it." And then, he says, deceased threw down, or wrapped up his lines and said, "I won't take that, get off of your horse." He thereupon got off his horse, pulled off his glove at the time and after he got on the ground the deceased struck him with the whip handle; that he got up only partially into the wagon of the deceased and cut him several times with his knife; that deceased started to pick up some piece of iron or something else in the back part of the wagon,—he didn't know what it was, and fearing the deceased would strike him and injure him therewith, he cut deceased in self-defense.

The evidence shows that deceased was cut several times. It seems,—three cuts on his shoulder and back, and another in the left side in the region of the heart. The doctor said while he didn't know the depth of any of the wounds, not having probed them, that if the one in the back below the shoulder blade and the one in the left side were deep enough, either, or both would be fatal. One or the other, or both were fatal because deceased died therefrom within a very short time.

Appellant said he never got entirely in the wagon of the deceased; that he only put one foot over the side of the bed. Mrs. Garrett, who lived some fifty or sixty yards from where the stabbing occurred, swore that while she did not see the fight, her attention not being directed towards it at the time, that she did see appellant jump out of the wagon and that

he was entirely in the wagon at the time he jumped out and that at the time, the deceased was standing holding his lines with both hands. John Brown, the brother of deceased, who at the time of the fight was traveling the same road, meeting the deceased and was some 200 or 300 yards from him at the time the fight occurred, said there was no obstruction between him and the parties; that when the deceased and appellant stopped, appellant got off of his horse and climbed in the wagon and they went to fighting he was so far away at the time, however, he could not tell what appellant had in his hand, but he swore that appellant got entirely in the wagon and the fight occurred while he was entirely in the wagon, about the middle of it; that after the fight was over appellant jumped out of the wagon and deceased's brother started on. The deceased at no time got out of his wagon, nor did he attempt to do so. John Brown further testified that there was a piece of iron in the back part of the wagon bed, but that the deceased made no move to go back in the wagon, but remained in the front part where he was when he stopped; that appellant, when he first got down off his horse, made no stop but went right on into the wagon. He also swore that there was no blow passed between deceased and appellant that he could tell, before appellant got in the wagon, and that deceased did not strike the appellant before appellant got in the wagon, that he could tell.

After appellant cut deceased he hurriedly got on his horse, leaving his glove and he and his companions rode away towards the town of Carbon, a few miles distant. After getting off some distance he sent one of his companions back for his glove. He then rode on towards Carbon, in a lope part of the way. As soon as he reached Carbon he saw Mr. D. S. Campbell and told him about the difficulty. Mr. Campbell says: "He told me that he had a racket with Ollie Brown (deceased). He said that they had had a fight out there and that he had cut Ollie with a knife. I says wasn't you big enough to lick him or whip him without a knife? He said that he had been aggravated with that outfit long enough. I believe he said that it made him mad. He said he had been aggravated with that outfit, or that darned outfit or damned outfit, something that way. He said the reason that he cut him was, that he had been aggravated by that damned outfit long enough." All this occurred very soon after the difficulty and before Mr. Campbell, the appellant or any of the others at Carbon, knew that deceased was dead. They heard it very soon afterwards. As soon as appellant heard it, he fled to escape arrest, but gave up that night. Appellant denied that he said to Mr. Campbell what Mr. Campbell testified he did.

Immediately after the difficulty the deceased attempted to drive home to his father's. His brother John met him almost immediately after the difficulty, asked what was the matter, deceased told him appellant had cut him and John got in the wagon to drive deceased to their father's, which he did. As soon as he got in the wagon, deceased fell over from the wounds. John put something under his head and drove in an ordi-

nary trot over an ordinary clayed road to their father's, a mile and a quarter distant. Deceased died before reaching his home.

We deem it unnecessary to make any further statement of the case.

Omitting the usual head of the style and number of this cause and the court, and the usual "Be it remembered," we quote in full one of appellant's bills:

"At the time that the court administered the oath to the regular panel of the jury for the week, and tested them as to their qualifications as jurors, which panel was to try all cases for the week, and in the presence of the following jurors, towit: (giving the names of sixteen), seven of whom were later chosen as jurors in the John Reed case, the court made the following remarks to the said regular jurors for the week, towit:

"The court: (a) In the trial of every case in the District Court it is frequently necessary, during the trial for the court to retire the jury during the argument of counsel on the admissibility of testimony. That is a matter which is controlled by law and when you are forced to retire every few minutes, if that should be the case, you must not become nettled at even the attorneys who make the objections, or anyone else. The law demands it, and you are as much responsible for it as anybody else, so you will have to take it as a matter of course. I mention this because sometimes jurors become nettled at attorneys for making objections which force them to retire. It is the duty of a good attorney to make an objection whenever he thinks it is to the interest of his client, and the law requires that the court should retire you, and so it is a matter over which none of us have any control. We just have to take it as a matter of course.

"(b) You are asked on your voir dire frequently whether you know anything about a given case and at the time being you may not remember that you do know anything about it and you so answer and are taken on the jury. Later on the evidence of some witness may remind you of some fact or circumstance about which you have personal knowledge. If that should occur, it would be your duty as a good juror to pay—to not consider it for any purpose—your private knowledge of the matter and you should not mention that to any of your colleagues, that you know anything about the case. You are to try the case solely upon the law and the evidence that is brought to your attention in the courthouse and not in regard to something you have heard on the outside.

"(c) You are asked on your voir dire, whether you will try a case according to the law and the evidence. That means evidence which is introduced and admitted by the court. That is, your oath covers that feature of the case, and if you considered anything that is not admitted by the court, you will be violating your oath and be doing a great injustice to the parties litigant. I have heard jurors, when I was in the practice, say that the court excluded testimony but they considered it just the same because they thought it was pertinent to the issue. Now, if you do that, you can see where you would be doing the parties a great injustice. They accept you on the jury believing that you will carry

out your oath and if you should consider that which is not admitted by the court you will be violating your oath as well as doing them a great injustice.

"(d)  The verdict of a petit jury in the District Court, is the agreed consensus of opinion of each and all twelve men on the jury. It is not what just one man thinks about the case—although it takes his opinion, agreed with the others, to constitute a verdict; it is not just what three men or five men or seven men or eleven men think; it is what each and all of the twelve men, after they have carefully considered the case—after they have exchanged ideas with each other—after they have discussed the matter from different viewpoints, it is what they are willing to agree upon in the case. Sometimes a juror, after he spends several days trying a case, goes into the jury consultation room and just because every other juror does not think exactly as he thinks, he thinks that there is no possible chance for the jury to agree and he thinks that there is a hung jury. Now that is a mistaken idea. Men ought to be willing to discuss matters among themselves and get each other's viewpoint. There is not two of you men alike. Everyone of you are different. You are different in your looks; your stature; your physiognomies; your viewpoints, and every way, and yet, that being the case, it is possible for twelve men—dissimilar in every way, to reach a verdict that is just and righteous according to the law and the facts in the case. A hung jury is a detriment to the interests of the State and also to the defendant, and to parties litigant in civil cases. It ought to be just as easy for one set of twelve honest, upright, conscientious men constituting a jury to find a verdict on a given state of facts, and the law, as it would for any other jury of twelve men of equal conscientiousness. In other words, it ought to be just as easy for one jury to find a verdict on the same facts, as it is for another jury on the same facts to reach a verdict. Some of us imagine that all of the contrariness and arbitrariness in the world wear dresses. That is a mistake. Some of it wears pants. And if we would just weed out of the jury room all personal contrariness and personal arbitrariness, it would be very easy for you to find a verdict on the facts. (See [dd] below.)

"(e)  If you will just forget the standing of the parties; just forget what their names are; and who they are and try the case according to the evidence and the law, a jury would have little trouble in reaching a verdict. If you will just forget for the time being who the parties are, and their identity and their names and all about them and just try it as though you had never heard of it before and then it is tried in a just and a righteous way. The parties then get the benefit of the law applied to the facts of that particular case.

"(f)  Now we are going to meet, gentlemen, every morning at eight-thirty until you are discharged. We met at eleven this morning in order to give the parties who live in the outskirts of the county a chance to come in, and to not have to leave home Sunday. It is inconvenient to a great many parties, but we are going to hold a night session tonight to

make up for the lost time today, so be sure to be here promptly at eight-thirty every morning until you are discharged, so that we can expedite business. There is one other matter I want to call your attention to.

"(g) In the trial of every criminal case, a defendant is permitted by law to testify in his own behalf. That is a matter, however, which is regulated almost entirely by the judgment and the discretion of his counsel. An attorney, under our law, might have a good reason consistent with the innocence of his client for not placing him on the stand. Under our law, where a defendant does not testify, you not only can not consider it against him, but you can not even mention that fact to any of your colleagues. If you should mention it, it would cause the court to set aside any verdict you might render, and might possibly cause the court to place a punishment upon the juror who disobeys the instructions, so you want to be very careful.

"After the court had made said remarks, Mr. Stubblefield, attorney for John Reed, said:

"I want to except in behalf of John Reed and also in behalf of Nelson, and I except to it for the following reasons: (1) That this is a charge not in writing and before the jury is empaneled; and (2) it is not a correct statement of the law in this State in reference to the matters dealt with. And (3) it has a tendency and will be productive of coercion in forcing jurors to agree on verdicts in an improper manner that would not otherwise occur, and would be in derogation of the rights of the defendant. (4) That it is calculated to impress a jury with the idea that if one man thinks a man is not guilty, that he should yield his opinion in deference to the other eleven men and consent to a verdict; that it is prejudicial to the rights of the defendant. I especially except to that portion of your Honor's remarks in which the court says, 'It is to the interest of the defendant not to have a hung jury.'

"The court: 'All right, I will note that you except.'

"The court: 'If it will do you gentlemen any good I will state that during every term of court for six years there has been like exceptions to these. This charge I have been giving to the jurors for six years and there have been bills of exceptions to it and not a case yet has been reversed on that ground.'

"Whereupon Mr. Stubblefield, attorney for John Reed, said:

" 'I except to that remark of the court in the presence of the panel as being improper. As being an improper remark, and I desire to add to my exception further that the court in his charge to the jury nowhere instructs them that the verdict must represent the individual conscience and judgment of each of the jurors. That, I don't think, is in your Honor's instructions.'

"The court: That was in the court's instructions. (dd) I told the jury that while it takes the judgment of each man to make the verdict, yet, it was, after all, what they were willing to agree upon after discussing the matter among themselves. While it took each and all of them to make a verdict—twelve men to constitute a verdict—I want that

understood. If the stenographer did not take it, then I want that under-stood.

"And after said exceptions had been reserved to the remarks of the court, the following jurors were selected, to whom said instructions were given, and duly empaneled in the trial of the above styled and num-bered cause, towit: (giving the names of seven).

"The foregoing instructions were delivered to the said seven jurors, prior to the time that they were empaneled, and the exceptions herein-before urged, were urged by the counsel for the defendant at the time they were given to the jury.

"Premises considered, the defendant prays that this bill of exception be examined, approved and ordered filed, as a part of the record in this case, which is accordingly so done, this the 18th day of April, 1914."

We have subdivided the court's address, or remarks, just quoted, by letters of the alphabet for convenience in discussing them.

In no reasonable or proper way can these remarks, or address, by the district judge to the jury panel, be considered or construed as a charge in this case. What occurred, as shown by the bill, excludes any such idea. Besides, the court, in his written charge to the jury in this case in the first part of it, specifically told the jury: "I give you in charge *as the law applicable to this case* the following:" Then charges the law *as to this case* fully. Also, in the very last paragraph of the charge proper, he again specifically told the jury that they were the exclusive judges of the facts and the credibility of the witnesses, "but *the law of the case* you are bound to receive from the court, *as herein given you, and be gov-erned thereby.*" When our whole judicial system was first provided, the theory and policy of the State and the Legislature, was to have intelli-gent, honest, fair and impartial jurors in every case, whether civil or criminal. Whenever the Legislature has amended the original judicial system as to the juries, the whole trend of the legislation has been to provide new procedure to get more certainly competent, intelligent, fair and impartial jurors. In providing for jury commissioners to select juries, they are required to swear that they will not knowingly elect (select) any man as a juryman, whom they believe to be unfit and not qualified. (R. S., 5126.) They are required in selecting jurors, to select persons free from all legal exceptions, of good moral character, of sound judgment, well informed and who are able to read and write. (R. S., 5136.) When the jury commissioners have failed to select a sufficient number of jurors, or any, or whenever it becomes necessary for the sheriff to summon talesmen, he is required to swear, among other things, to select as such talesmen for jurors, none but impartial, sensible and sober men, having the qualifications of jurors. (R. S., 5170.) Each juror who serves in any criminal case, as in this, takes this oath: "You (I) solemnly swear that in the case of the State of Texas against John Reed, the defendant, you (I) will a true verdict render, according to the law and the evidence, so help you (me) God."

We know of no law, written or unwritten, which prohibits, directly,

or indirectly, the district judge from aiding the jurors to impartially, faithfully, fully, and intelligently discharge their duties. It seems to us that when an able and conscientious judge undertakes to do this and does it, in a fair and impartial manner, he should be commended instead of condemned. No man, not even an accused, should be heard to complain that the district judge fairly and impartially, and without any injury to him, attempts to aid a jury panel to properly, fairly, intelligently and impartially discharge their duties and functions as jurors.

But let us take up the several subjects of the court's remarks, or address to the jury panel. Subdivision (a) would clearly be fair and impartial,—if anything, more beneficial to an accused than to the State. So of subdivisions (b) and (c) and all the others. Take appellant's several objections to said remarks of the court. The first that the charge is not in writing, and before the jury is empaneled. We have conclusively shown above that this was not a charge in this case and by no legerdemain could be construed to be, but on the contrary, is conclusively and pointedly excluded as such. It was not a charge in this case and was not intended to be, and the jury could not have conceived that it was. His second objection, that it was not a correct statement of the law in reference to the matters dealt with. Wherein or how is this the case? This objection, in no possible way, points it out. It would be too general to require any consideration by this court, if this claimed charge should in full have been given to the jury in this particular case, under all the authorities.

Take the third objection, that it has a tendency and will be productive of coercion in forcing jurors to agree on verdicts in an improper manner, and would be in derogation of his rights. We fail to see how this could be possible. Take these remarks of the court in full and by no sort of reasonable construction could any of the claimed injuries result. No sort of coercion is suggested, or authorized. No sort of force to require a juror to find other than his verdict is suggested. The same thing is applicable to his fourth objection. To his suggestion that it is to his interest to have a hung jury, we state he has no right to a hung jury. If he is guilty and the evidence shows it beyond a reasonable doubt, he should be convicted, and no juror should hang the jury. If the State fails to prove beyond a reasonable doubt his guilt, he is entitled to a verdict of acquittal and no juror should hang the jury. That a hung jury which sometimes occurs, may result improperly in his favor may be true. It may always be to the interest of an accused, and especially a guilty one, to prevent his trial as long as possible. Witnesses die, they move away, they can't be found, they forget. All this may be in his favor, but he has no right to it. A hung jury may help to bring about these things, but he is not entitled to them as a matter of right,—it simply may inure to him because of the circumstances which may be unavoidable. If he had suspected that the verdict rendered was not the verdict of each and every juror, the statute expressly points out to him his remedy: That is to poll the jury and make each one state that is

*his* verdict. He did not even avail himself of this right,—doubtless because he was perfectly satisfied it was the verdict of each juror, and that said remarks or address by the judge did not and could not have had any such effect as he now mentions.

A special objection is made,—not in the court below, not by bill of exceptions,—but now in this court, to subdivision (e) of said remarks of the court to the effect that the jurors must forget the standing of the parties, their names and who they are, *but must try the case according to the evidence and the law.* Stated in another way, that they were to forget, for the time being, who the parties are and their identity and their names and all about them and *just try the case as though they had never heard of it before, and then to try it in a just and righteous way; that the parties then get the benefit of the law applied to that particular case.* Who on earth could have any valid objections to this? This court has reversed many cases because of the remarks of the prosecuting attorneys, out of the record. It has also reversed many cases where it was made to appear that outside influences induced a conviction. In other words, this court has always held that each case must be tried alone on the evidence that was introduced in that case, and that no outside evidence whatever, whether for or against an accused, could or should be considered. By no construction can this subdivision of the court's remarks be otherwise understood than the plain language imports, that *they are to try each case according to the law and the evidence introduced in that case and not to consider any outside matters whatever.* By no possible construction could this language, either directly or indirectly, be construed to mean that the jury was not to give the proper consideration to any evidence the defendant introduced as to his general reputation as a peaceable, quiet and law-abiding man, on the merits of the case, or to enable the jury to suspend the sentence if they found him guilty of manslaughter.

But suppose that by some sort of means these remarks to the jury panel by the judge could have been misconstrued by the jury to appellant's disadvantage. His attorneys heard it all, and for him objected to it at the time. When his case was afterwards called he made no voir dire or other examination of the seven jurors, or of the sixteen, even, and in no way elicited from them, or either of them, that they would be in any way, improperly or otherwise, influenced by said remarks by the court, nor that they would in any other way try this case other than according to the law as given by the court, and evidence as introduced, *in this case.* In other words, neither by implication, nor otherwise, does he show that either of the jurors were disqualified, biased, or prejudiced in any way, from sitting in the case because of the said remarks of the judge. He made no challenge of the panel, or any juror because thereof. He did not exhaust his challenges, in fact, is not shown to have made a single challenge. He in no way shows that any disqualified, or objectionable juror was forced on him.

Under all the authorities, unless this is done and an objectionable

disqualified juror is forced upon him and he shows this by proper bill, has he the slightest grounds for a reversal. It is needless to cite the cases. The books are full of them, and they are all the same way.

So that, in no contingency, and in no way does he show himself entitled to a new trial in this case because of the said remarks of address of the district judge to the jury panel. McGaughey v. State, 169 S. W. Rep., 287, recently decided. The cases of Chapman v. State, 42 Texas Crim. Rep., 135; Attaway v. State, 41 Texas Crim. Rep., 395; Jones v. State, 51 S. W. Rep., 949, and Murphy v. State, 57 S. W. Rep., 967, have no application to this case. What the judge said, as shown by those several cases, is nothing like what this judge said on this occasion.

There is no law that requires the judge, when a jury is to be empaneled in a felony case—not capital—to summon other jurors when there are more than twelve to select from in the panel and presented for challenge. The court in this instance followed the statute and committed no error in not summoning other than the first sixteen jurors who were selected by the jury commissioners. See articles 702 et seq., C. C. P., and decisions thereunder.

No error whatever is shown by the court permitting what was claimed to be a leading question to the witness John Brown. Carter v. State, 59 Texas Crim. Rep., 73. Besides, the court, in qualifying appellant's bill, states: "The court exercised his discretion in permitting the question."

Neither did the court commit any error in permitting Mr. A. C. Brown to testify that, at the time appellant accused him of killing his dog and his threat that he could whip the damn son-of-a-bitch who did it, appellant had or put his hand in his pocket. This would clearly be admissible to show appellant's motive and malice when he afterward saw deceased, whom he then charged with killing the dog.

The only other complaint appellant has is to this paragraph of the court's charge:

"If you should believe from the evidence that the defendant provoked a difficulty with the deceased, if he did do so, causing the deceased to assault defendant, if he did do so, and if a mutual combat ensued in which the defendant cut deceased, if he did do so; but you should further believe that when provoking said difficulty, if he did do so, the defendant intended to engage in an ordinary fight, and had no intention of killing the deceased, then you could not find the defendant guilty of any higher offense than of manslaughter." This charge unquestionably is a part of the court's charge on manslaughter, intended so and the place it occupies in the charge clearly makes it so. The court, in the previous part of the charge, had submitted appellant's defense of self-defense clearly and distinctly, unhampered by any charge on provoking the difficulty. It is specifically required by the evidence and under the former decision of this case. The evidence in this case clearly raised the question of mutual combat. It also clearly raised the question of whether or not the defendant intended only to engage in an ordinary fight and had no

intention of killing the deceased. In either of these events if the killing had occurred because thereof, he would not have been guilty of murder but of manslaughter only, as this charge specifically tells the jury. This court, in the former appeal, distinctly so stated and reversed the case partly because such a charge was not given.

The fact that the court did not limit appellant's defense of self-defense, but charged on provoking the difficulty, was in appellant's favor and not against him. If this charge could be construed to be such a limitation it unquestionably was called for by the evidence in this case. There can be no doubt from the evidence that provoking the difficulty by appellant was clearly raised against him. Coleman v. State, 49 Texas Crim. Rep., 355; Sanders v. State, 83 S. W. Rep., 712; Bateson v. State, 46 Texas Crim. Rep., 34; McGrew v. State, 49 S. W. Rep., 226; Winters v. State, 51 S. W. Rep., 1110; Nickerson v. State, 69 Texas Crim. Rep., 659, 154 S. W. Rep., 992; Luttrell v. State, 70 Texas Crim. Rep., 183, 159 S. W. Rep., 159; Shoemaker v. State, 71 Texas Crim. Rep., 445, 160 S. W. Rep, 356; Carver v. State, 67 Texas Crim. Rep., 116, 148 S. W. Rep., 746. It is needless to cite the many other cases.

The evidence in this case was amply sufficient to show appellant's guilt. There was no error in the trial. The judgment is affirmed.

*Affirmed.*

[Rehearing denied June 26, 1914.—Reporter.]

DAVIDSON, JUDGE (dissenting).—It is unnecessary to make any further statement of the case than that made by Judge Prendergast in the majority opinion. The opinion quotes fully the bill of exceptions reserved to the verbal charge or instruction given the jury just before they were empaneled, seven of whom tried the case. This was a very lengthy verbal charge, and the bill of exceptions recites that this charge was given the regular panel of the jury for the week at the time they were sworn and their qualifications as jurors tested. This jury was to try appellant's case. The bill, after reciting fully the charge so given, closes with this statement: "The foregoing instructions were delivered to the said seven jurors prior to the time that they were empaneled, and the exceptions hereinbefore urged were urged by counsel for the defendant at the time they were given to the jury." While not positively so stated, yet it is apparent from the record and the bill that appellant himself was not present at the time this charge was given to the jury. My brethren say this was not a charge to the jury. If it was not, then I fail to understand what to call it. There are quite a number of objections urged to this charge which are also stated in the majority opinion, which I deem unnecessary to restate. A similar charge and under similar circumstances was condemned in the cases of Chapman v. State, 42 Texas Crim. Rep., 135; Attaway v. State, 41 Texas Crim. Rep., 395; Jones v. State, 51 S. W. Rep., 949; Murphy v. State, 57 S. W. Rep., 967. The majority opinion refers to these cases as being cited by appellant in support of his contention, that the trial court was in

error in verbally instructing the jury as it did, but they hold that these cases are not in point and not applicable. Just why they are not in point and why they are not applicable is not stated in the opinion, and I confess that I do not understand why they are not in point or why they are not applicable. While the language in this case is not identical, yet this charge compared with those charges is in substance the same. Our statute provides that in all felony cases the court shall give his charge in writing, and distinctly set forth the law of the case. It has always been held that the court can not give a verbal charge in a felony case, because the statute requires it shall be in writing. No charge can be given until after the evidence has been adduced. Another statute expressly provides that, "It is beyond the province of a judge sitting in criminal causes to discuss the facts or use any argument in his charge calculated to arouse the sympathy or excite the passions of a jury. It is his duty to state plainly the law of the case." The court in this verbal charge *did not state the law of this case,* but some features of it are positively in contradiction of all the decisions in Texas bearing upon the question of charging on the weight of the evidence. On this issue of general good character Mr. Branch, in his excellent work on Criminal Law, tersely and correctly states the rule as follows: "Defendant may prove his general good character when guilty knowledge or criminal intention is of the essence of the offense," section 332, citing Poyner v. State, 48 S. W. Rep., 516; House v. State, 42 Texas Crim. Rep., 125; Jones v. State, 10 Texas Crim. App., 552; Coffey v. State, 1 Texas Crim. App., 548; Lincecum v. State, 29 Texas Crim. App., 328; Lann v. State, 25 Texas Crim. App., 497; Lockhart v. State, 3 Texas Crim. App., 567. It was also held in Lee v. State, 2 Texas Crim. App., 338, that it was error to charge that evidence as to the defendant's character is immaterial. It was further held that evidence of good character is admissible as relevant to the credibility of the evidence against the accused, and like any other fact is to be considered by the jury in determining whether or not his guilt has been established beyond a reasonable doubt. Its competency is not restricted to doubtful cases. This is the general rule and applies to all cases where that issue is involved. In this particular case the intent of the defendant was one of the most crucial, critical points raised on the trial. The evidence upon which the jury based their verdict for murder in the second degree is exceedingly doubtful, if in fact it is sufficient. The opinion of the writer is that the evidence did not show a higher degree of guilt from the standpoint of the State than imperfect self-defense or manslaughter. Appellant put his reputation in issue, and fully proved his high character. Again, he filed under the Act of the Thirty-third Legislature, page 8, his plea for suspension of the sentence in case of conviction for manslaughter. Section 2 of that Act provides that the court shall permit testimony and submit the question as to the general reputation of the defendant to enable the jury to determine whether to recommend the suspension of sentence, and as to whether the defendant was ever before convicted of a felony. Such

testimony shall be heard and such question submitted upon the request in writing of the defendant. The defendant placed his reputation in issue, and fully sustained it by evidence, yet the court in his verbal charge instructed the jury that they should not regard "the standing of the parties"; they should forget who they are and ignore "their standing," and "their names," etc., and in his general charge to the jury did not instruct them with reference to his reputation. His reputation then necessarily was more vital in this case than it would have been had appellant not filed his plea for suspension of sentence. Bearing upon his intent in the homicide, his reputation was of critical moment, and this instruction of the court to the jury may have induced them to disregard his reputation or character and find the issue against him on the question of manslaughter and suspension of sentence. A jury should never be told that high standing, good reputation or upright character should not be regarded by them in making up a verdict. They gave him murder in the second degree with eight years confinement in the penitentiary. Having verbally instructed seven of the jurors who tried him that they should not regard the high standing of parties, it would be but natural for the jury to conclude that such evidence should not enter into their verdict on the plea of suspended sentence. No one would question the illegality of this charge or the error if the court had instructed the jury in his written charge that they should not regard "the high standing" of the defendant in making up their verdict. This conviction would not have lasted in this court longer than it would have taken a short opinion to reverse had such charge been given in the written instructions by the court, yet seven of the jurors went into the trial of the defendant under this verbal charge of the court not to consider his "high standing." The evidence of his "high standing," his good character, was one of the highest importance, and proved one of the grounds for suspending his sentence.

There are other phases of this verbal charge that are subject to serious criticism that I do not care to discuss in the condition of the record. In the Chapman case, supra, a similar charge, or one of similar import was given by the court, but it related more to the proposition of apparent danger and reasonable doubt, and this court reversed because of that instruction given the jury before they were empaneled. The Chapman case has been followed in other cases, and it itself followed the case of Jones v. State, supra, and Attaway v. State, supra. I do not know that I could add anything here to what was said in that case. If the court had instructed the jury in writing that they should not consider the "high standing" and good reputation and character of the defendant from any viewpoint this judgment would have been reversed, and that would be emphasized by the fact that he had filed a plea for suspended sentence and proved beyond any question his high character, and yet the court instructs the jury verbally they must "not regard the high standing" of the defendant. I deem it unnecessary to go further into a discussion of this phase of the case.

There is another question urged by appellant that it occurs to me shows merit. The court charged upon provoking a difficulty. I am of the opinion that the question was not in the case. There was a phase of the testimony calling for a charge on mutual combat, but the court uses the same facts which brought about the reason for charging on mutual combat, and applied it also on the question of provoking a difficulty. Of course, if appellant provoked a difficulty, it would be a limitation upon his right of self-defense, but if he did not, then the error would be grossly wrong. He relied upon self-defense. The court charged the theory of self-defense, and under our statute it occurs to me that the provoking of the difficulty was not in the case. When appellant asked the deceased if he had killed his dog, the deceased replied to him, "What are you going to do about it?" Appellant, in substance, said that it takes a son-of-a-bitch to kill his dog, whereupon the deceased said he would not take that and invited appellant from his horse. Appellant dismounted, whereupon deceased struck him on the head and on his hand with the "whipstock" with which he was driving, that is, the staff of his whip, inflicting pain and also a knot as I recall the testimony. Insulting language will not justify an assault. The assault here was made by the deceased. Appellant had accepted the invitation to get down from his horse. Appellant may have understood there might be a fist fight as the parties were not armed so as to indicate any other character of fight was contemplated. Appellant had nothing but his pocket knife, and the deceased was driving his team with a whip, the staff of which was heavy enough to inflict pain. When appellant alighted deceased struck him over the head and on the hand and a fight began. I am inclined to believe that the court should not have charged on provoking a difficulty. It is sometimes a little difficult to tell just what may provoke a difficulty. While the provocation might not justify an assault, yet sometimes insulting language will bring about or produce the occasion; but appellant only accepted the invitation of the deceased to alight from his horse. What would have become of the matter had deceased not struck him on the head of course is but a conjecture. Appellant had not done anything to this time except get off his horse. Deceased made the assault and began this difficulty. So from any viewpoint I am of the opinion the charge on provoking a difficulty should not have been given.

For the reasons above given I respectfully enter my dissent.