### W. I. TYRONE V. THE STATE.

No. 3567.   Decided June 23, 1915.

Rehearing denied October 13, 1915.

**1.—Murder—Manslaughter—Jury and Jury Law—Verbal Charge.**

Where, upon trial of murder and a conviction of manslaughter, the appellant complained because the court gave an oral instruction to the panel of jurors for the week before his case was called for trial, and before it was set for trial, but the record showed that defendant had not exhausted his peremptory challenges, when two of said jurors were accepted from the special

venire, and that said instructions were not improper but commendable, there was no reversible error. Following McGaughey v. State, 74 Texas Crim. Rep., 529, and other cases. Davidson, Judge, dissenting.

**2.—Same—Conduct of District Attorney—Examination of Witnesses—Memorandum.**

Where defendant's counsel objected to the district attorney's conduct in reading from the testimony before the grand jury, and the district attorney replied thereto that he was not reading from the grand jury testimony, but was referring to private notes in order to know how to frame questions to the witness, and no testimony was offered to show that the paper in the hands of the district attorney was such testimony, there was no reversible error.

**3.—Same—Remarks by Judge—Colloquy Between Counsel,**

Upon trial of murder, it was proper for the trial court in order to stop further colloquy between counsel, and to preserve order and decorum, to state that he didn't want any more time wasted with frivolous controversies.

**4.—Same—Evidence—Husband and Wife—Cross-examination.**

Where, upon trial of murder and a conviction of manslaughter, defendant placed his wife on the stand as a witness, and elicited from her testimony that deceased had exerted hypnotic influence over her to such an extent that she was powerless to resist him, when she permitted him to have carnal intercourse with her, etc., the State had the right on cross-examination, not only to show what her husband said when such information was first communicated to him, but how he was affected, and also to lay a predicate for impeachment; besides, no answer was given to the question propounded, as shown by the bill of exceptions, while the statement of facts, if consulted, showed that a negative answer was given.

**5.—Same—Argument of Counsel—Memorandum—Quoting Testimony.**

Where, upon trial of murder and a conviction of manslaughter, appellant complained that the court erred in permitting the district attorney in his closing argument to read from a memorandum made by himself, which he referred to as testimony of some of the witnesses, but the court gave oral and written instructions that the jury should not consider this as evidence, there was no reversible error; besides, there was no error if the district attorney had been permitted in quoting from his memorandum the words of the witnesses, leaving it to the jury whether he had made a correct quotation.

**6.—Same—Instructions to the Jury—Remarks by Court.**

Where appellant contended that the trial court erred in sending for the jury after they had been deliberating on their verdict and telling them that he had to go home, and urging them to continue their deliberations conscientiously, in an effort to arrive at a verdict, there was no reversible error. Following Wilkerson v. State, 49 Texas Crim. Rep., 170, and other cases.

**7.—Same—Conduct of Trial Judge—Adjournment.**

Where, during the trial, the judge found it necessary to go to his home, this did not ipso facto adjourn said court, as he returned on the next day, and remained in attendance on court. Following White v. State, 61 Texas Crim. Rep., 498, and other cases.

**8.—Same—Newly Discovered Evidence—Hypnotic Influence.**

Where, upon trial of murder and a conviction of manslaughter, defendant in his motion for new trial contended that the court had erred in admitting testimony that it was impossible for any person to wield a hypnotic influence over another person to the extent that such person would submit to sexual embrace, etc., and that defendant had discovered an expert witness who would testify to the contrary, there was no error in overruling the motion, as de-

fendant had not exercised proper diligence to procure such testimony at the trial.

### 9.—Same—Sufficiency of the Evidence.

Where, upon trial of murder and a conviction of manslaughter, the evidence sustained the conviction under a proper charge of the court, there was no reversible error. Davidson, Judge, dissenting.

Appeal from the District Court of Eastland. Tried below before the Hon. Thos. L. Blanton.

Appeal from a conviction of manslaughter; penalty, five years imprisonment in the penitentiary.

The following is the oral instruction of the court to the panel of jurors for the week before the case was set for trial:

"In the trial of every case in the District Court it is frequently necessary during the trial for the court to retire the jury during argument of counsel on the admissibility of testimony; that is a matter which is controlled by law, and when you are forced to retire every few minutes, if that should be the case, you must not become nettled at the attorneys who make the objections, or anyone else, as the law demands it, and you are as much responsible for it as anyone else; so you will have to take it as a matter of course. I mention this because sometimes jurors become nettled at attorneys for making objections, which forces jurors to retire. It is the duty of a good attorney to make an objection whenever he thinks it is to the interest of his client, and the law requires that the court should retire you, and so it is a matter over which none of us have any control. We just have to take it as a matter of course.

"You are asked on your voir dire frequently whether you know anything about a given case, and at the time being you may not remember that you do know anything about it, and you so answer, and are taken on the jury; later on the evidence of some witness may remind you of some fact or circumstance about which you have personal knowledge. If that should occur, it would be your duty as a good juror, not to consider it for any purpose—your private knowledge of the matter— and you should not mention that to any of your colleagues that you know anything about the case; you are to try the case solely upon the law and the evidence that is brought to your attention in the courthouse, and not in regard to something you have heard on the outside; you are asked on your voir dire whether you will try a case according to the law and the evidence, that means evidence which is introduced and admitted by the court, and if you consider anything that is not admitted by the court, you would be violating your oath, and be doing a great injustice to the parties litigant; I have heard jurors when I was in the practice say that the court excluded testimony, but they considered it just the same, because they thought it was pertinent to the issues; now if you do that, you can see where you would be doing the parties a great injustice. They accept you on the jury, believing that you will carry out your oath, and if you should consider that which is not admitted by the court, you will be violating your oath, as well as doing them a great injustice.

"The verdict of a petit jury in the District Court is the agreed consensus of opinion of each and all twelve men on the jury, it is not altogether what just one man thinks about the case, although it takes his opinion agreed to with the others to constitute a verdict; it is not just what three men, or five men, or seven, or eleven men, think, it is what each and all of the twelve men, after they have carefully considered the case, after they have exchanged ideas with each other, after they have discussed the matter from different viewpoints—it is what they are willing to agree upon in the case. Sometimes a juror, after he spends several days trying a case, goes into the jury consultation room, and just because every other juror does not think just exactly as he thinks, he thinks that there is no possible chance for the jury to agree, and he thinks that there is a hung jury. Men ought to be willing to discuss a matter among themselves, and get each other's viewpoint; there is no two of you men alike, every one of you is different, you are different in your looks, your stature, your physiognomy, your viewpoints, and every way, and yet, that being the case, it is possible for twelve men, dissimilar in every way, to reach a verdict that is just and righteous, according to the law and the facts in the case. A hung jury is a detriment to the interest of the State, and also to the defendant, and to all parties litigant in civil cases; it ought to be just as easy for one set of twelve honest, upright, conscientious men, constituting a jury, to find a verdict on a given state of facts, and the law, as it would be for any other jury of twelve men of equal conscientiousness; in other words, it ought to be just as easy for one jury to find a verdict under the same facts as it is for another jury on the same facts to reach a verdict.

"Some of us imagine that all the contrariness on (in) the world wears dresses. That is a mistake. Some of it wears pants, and if we would just weed out of a jury room all personal contrariness, personal arbitrariness, it would be very easy for you to find a verdict on the facts. If you will just forget the standing of parties, just forget what their names are, who they are, and try the case according to the evidence and the law, a jury would have little trouble in reaching a verdict; if you will just forget for the time being who the parties are, their standing and their identity, and their names and all about them, and just try the case as though you had never heard of it before, and then it is tried in a just and righteous way. The parties then get the benefit of the law applied to the facts of that particular case.

"In the trial of every criminal case a defendant is permitted to testify in his own behalf. That is a matter, however, which is regulated almost entirely, by the judgment and discretion of his counsel. An attorney under our law might have a good reason, consistent with the innocence of his client, for not placing him on the stand. Under our law, where the defendant does not testify, you not only can not consider it against him, but you can not even mention the fact to any of your colleagues. If you should mention it, it would cause the court to set aside any verdict you might render, and might possibly cause the court

to place a punishment on the juror who disobeys instructions; so you want to be very careful."

*W. L. Morris, S. W. Bishop,* and *J. R. Stubblefield,* for appellant.—On question of court's instructions to jury panel a week before the trial was set, out of which panel two jurors were accepted on the trial from the special venire: Reed v. State, 74 Texas Crim. Rep., 242, 168 S. W. Rep., 541; Jones v. State, 51 S. W. Rep., 949; Murphy v. State, 57 S. W. Rep., 967; Chapman v. State, 42 Texas Crim. Rep., 135; Attaway v. State, 41 id., 395.

*C. C. McDonald,* Assistant Attorney General, for the State.

HARPER, JUDGE.—Appellant was convicted at the January, 1915, term of the District Court of Eastland County of manslaughter and his punishment was assessed by the jury at confinement in the State penitentiary for a period of five years.

Our able Assistant Attorney General has so ably discussed and disposed of every question raised in the motion for a new trial, we adopt the brief as the opinion of the court:

"Bill No. 1 complains that the court erred in giving verbal instructions to the panel of jurors for the week before this case was called for trial and before it was set for trial. A special venire was afterwards ordered and two men, Lane and Gillette, who were on the panel for the second week, were accepted as jurors. At the time appellant made no objection to either juror and the record does not disclose that appellant had exhausted his peremptory challenges when either of said jurors was accepted. This complaint is wholly without merit. Reed v. State, 74 Texas Crim. Rep., 242, 168 S. W. Rep., 541; McGaughey v. State, 74 Texas Crim. Rep., 529, 169 S. W. Rep., 287. But not only is this bill wholly without merit, but the entire instruction copied in this bill and delivered to the jury for the week on the part of the trial court was so able and so proper and so commendable that I ask this court, if they agree with me in this view, to copy said instruction in the opinion that it may be preserved in the jurisprudence of our State as an able appeal to the loftiest sentiments of citizenship.

"In the next two bills appellant complains that the court erred in permitting counsel for the State to read from a memorandum testimony which was given by the witness Alvin Tyrone before the grand jury, for the purpose of impeaching said witness and for the further purpose of placing him in a bad attitude before the jury, it being alleged that said witness was not an unwilling witness and State's counsel was not surprised at his testimony. The bill further complains that the court, in the presence and hearing of the jury, said to counsel: 'Gentlemen, I don't want any more of the time of the court wasted with frivolous controversies,' it being alleged that said remark was calculated to prejudice the rights of appellant. These bills as qualified and

as accepted by appellant show that the only objection or exception taken by appellant was with reference to the district attorney's questioning the witness while looking at a piece of paper which he had in his hand. Judge Morris, for appellant, stated he objected to counsel reading from the testimony before the grand jury, and the district attorney replied that he was not reading from the grand jury testimony but was referring to private notes in order to know how to frame questions to the witness. The court thereupon said that if it was the private notes of counsel he had a right to refresh his memory with them. Counsel for appellant then said it was either the grand jury testimony or testimony taken at the examining trial. The court ruled that if the district attorney was using either grand jury testimony or examining trial testimony the defendant could see it but he had no right to see private notes of counsel for the State used purely as a memorandum to refresh his memory. These bills as qualified and accepted by appellant are wholly without merit, because appellant's counsel offered no testimony to show that the paper in the hands of the district attorney was testimony adduced at any former trial or hearing. And it was certainly proper for the court, in order to stop further colloquy between counsel in the courtroom and in order to preserve order and decorum, to state to counsel to be seated,—that he didn't want any more time wasted with frivolous controversies, such as this one was.

"In the next bill appellant complains that the court erred in permitting the State to ask the witness Mrs. W. I. Tyrone, on cross-examination, over appellant's objection,—'Is it not a fact that your husband, W. I. Tyrone, had you to place one hand on the Bible and one hand on your heart and say that there had never been anything wrong between you and Dr. Evers?' The bill nowhere discloses what answer was given to said question. But reference to the statement of facts discloses that the witness answered that he had not. In the first place, this was certainly legitimate and proper cross-examination. The defendant himself placed his wife on the stand and elicited from her the remarkable story that deceased had exerted hypnotic influence over her to such an extent that she was powerless to resist him, and that, being absolutely devoid of will power yet conscious of the doctor's acts, and while under his influence she yielded to deceased and permitted him to have carnal intercourse with her; and further, that she had communicated the story of her debauchery to her husband and that on account of the children they had agreed to keep it quiet; that before she would tell him she exacted a promise from him that he would not kill deceased, etc. Certainly, therefore, the State had the right to ask her on cross-examination, not only what her husband said when such information was first communicated to him, but how he was affected, and any other matter proper and material to the main testimony given, and further for the purpose of laying a predicate for her impeachment on any of such matters. See Lee Stacy case, recently decided. In the second place, since no answer is set out in the bill, the same is insufficient as this court can not determine whether or not

appellant was injuriously affected. And if reference be had to the statement of facts, it will be observed that a negative answer was returned to said question, and hence appellant can not claim that he was prejudiced thereby.

"Appellant also complains that the court erred in permitting the district attorney in his closing argument to read from a written memorandum made by himself which he referred to as testimony of some of the witnesses. Counsel for appellant thereupon requested the following instruction: 'You are instructed that the statement of the district attorney that a certain written instrument was the evidence of a witness in this case is not evidence and you will not consider the statement so made by the district attorney whatever, but you will disregard such statement and you can not consider the same against this defendant for any purpose.' It appears that when objection was made the court immediately orally instructed the jury that they could not consider the argument of the district attorney or of any other attorney as evidence in the case, and that the written memorandum from which the district attorney read to them a moment before while making his argument was not evidence and they should disregard the same. He further instructed them in this connection that unless they found that arguments of counsel were supported by the record evidence in the case they should disregard any portion of the same not supported by such evidence. However, after delivering such oral instruction, counsel for appellant wrote out a written charge to the same effect and asked the court to again interrupt State's counsel in order to read their written charge,—which the court marked *given,* and the court declined further to interrupt the speech of State's counsel. Said special charge was, however, handed to the jury with the court's main charge. As I view the matter, this bill is absolutely without the semblance of merit, and I believe it would be had the court refused to give either the written charge or the oral instruction. The writer of this brief has scarcely addressed a jury in a murder case in which he did not take notes during the trial of the cause on important testimony from leading witnesses and copied it in his memorandum book, and while addressing the jury, in order to be absolutely correct in quoting the witnesses, would read from the memorandum the exact words by the witnesses, and has left it to the jury to say whether or not he was correct in quoting said witnesses' testimony. But in this case appellant certainly can not complain because he had the benefit of both oral and written instructions; and since the court had orally instructed them, certainly he was not called upon to again read to the jury the special charge which he had given.

"Appellant contends the court erred in sending for the jury after they had been deliberating on their verdict about twenty-four hours and telling them he had to go to his home in Abilene and urging them to continue their deliberation conscientiously in an effort to arrive at a verdict. The remarks are set out in full in the bill to which the court is respectfully referred. I submit that said instructions were

altogether proper and commendable, and were but an appeal to the
jury to do their duty as good citizens. His entire statement to them
is absolutely devoid of a single improper reference or remark as I view
it. He distinctly told them to take plenty of time, do good work, and
stay in good humor,—all of which instructions were devoid of prejudices conducive to a well considered, impartial, unbiased verdict.
Muckleroy v. State, 42 S. W. Rep., 383; Dow v. State, 31 Texas Crim.
Rep., 278; Jordan v. State, 30 S. W. Rep., 445; Wilkerson v. State,
49 Texas Crim. Rep., 170; Brady v. State, 74 S. W. Rep., 771; Carlisle
v. State, 56 S. W. Rep., 365. I also submit that the necessity of the
judge's going to his home in Abilene did not ipso facto adjourn said
court, and that part of this complaint is without merit. White v. State,
61 Texas Crim. Rep., 498; Scott v. State, 47 Texas Crim. Rep., 568.
He returned on the next day and remained in attendance on court.

"Appellant contends that the court erred in overruling his motion
for a new trial on the ground of newly discovered evidence in this:
that the State, over objection of appellant, proved by the witness Dr.
Sheppard that it was impossible for any person to wield a hypnotic
influence over another person to the extent that such person would submit to the sexual embrace of such other person, or that the person under
such influence would lose all will power to resist such act of intercourse,
etc. Appellant alleges that for the first time, after the trial of this
cause, he ascertained that the witness Dr. Johnson, a resident of Eastland County, would testify to the contrary. In connection with this
bill I ask the court to refer to appellant's motion for new trial wherein
appellant alleges that Peterson and Haynes' 'Legal Medicine and Toxicology,' vol. 2, p. 138, states that there is no doubt that the hypnotic
state may be induced and used for sexual purposes, etc., and further
states that said book is a standard medical authority. I attribute appellant's complaint as to newly discovered testimony to the untiring
zeal on the part of his attorneys to find some pretext on which to hang
at least a faint hope for a reversal of his cause rather than to a desire
to submit any real substantial matter to the court in this bill. It would
be a reflection on the ability of appellant's counsel as criminal attorneys
to say that they could not foresee that when they introduced appellant's
wife and elicited from her her weird and unreasonable story her testimony would be attacked by the State from every legitimate angle. And
appellant's counsel must have known that the reasonableness of the
story would depend on the reasonableness of hypnotic power. That very
fact must have charged them with the duty to search the medical authorities on that subject; and when Dr. Sheppard had concluded his testimony they had but to refer to the standard medical work upon which
they rely for a new trial—the index of which would have immediately
directed them to the paragraph which they now claim as newly discovered evidence—and when they had found it, their necessity in the
case would have immediately prompted them to consult Dr. Johnson
and all other able physicians to find testimony further to support their
contention. But they did not even ask the time of the court to look

up the medical authority or to consult with a physician; and certainly they can not be heard to complain at this late date. The testimony of Dr. Sheppard adduced by the State and complained of herein was material on the part of the State because if appellant's wife's story was unreasonable and probably untrue, then it would certainly be considered by the jury as tending to throw light on the fact as to whether or not she ever communicated such a story to her husband prior to the homicide.

"Appellant also insists that the court erred in overruling his motion for new trial because the evidence was wholly insufficient to sustain the conviction for manslaughter. And in apparent sincerity appellant's counsel contend that this is true because *appellant himself* says that he killed deceased in self-defense and, therefore, if he did, he should of necessity have been acquitted. Appellant's counsel at the moment must have forgotten that there were other witnesses who testified in this case, among them being appellant's own children, his daughter-in-law, his aged mother, and others, and it must have for the moment escaped the attention of appellant's counsel that these witnesses had contradicted appellant on almost every material point in his entire testimony. The bill needs no further comment.

"The indictment in this case is valid and the State's witnesses, if they are to be believed,—and the jury evidently did believe them,— furnished ample testimony on which to base the conviction. The charge of the court presents in a most favorable light to appellant every defense even remotely raised by the evidence of appellant's witnesses. Indeed, the charge is so perfect that not a single exception is taken to it by appellant's counsel. And not a single requested charge as asked and refused. An extended statement of the facts would be useless. As I view the record it is absolutely clear of error on the part of the trial court and the judgment should be affirmed."

And as requested by Mr. McDonald, the reporter, in connection with this case, will publish the court's remarks to the jury when it was empaneled for the week.

The judgment is affirmed.

*Affirmed.*

DAVIDSON, JUDGE, dissenting.

[Rehearing denied October 13, 1915.—Reporter.]

November 17, 1915.

DAVIDSON, JUDGE (dissenting).—Before the adjournment of the last term of this court the judgment herein was affirmed. Motion for rehearing was filed and disposed of during the present term. I did not then believe, and in the light of further investigation am more fully persuaded the opinion is not correct, and that the judgment ought to have been reversed.

Appellant was allotted five years in the penitentiary under a conviction for manslaughter. As evidenced by the statute this is the

maximum punishment. This is mentioned for the reason that if there were any circumstances on the trial which led erroneously to conviction or to enhanced punishment, conceding appellant's guilt, then the verdict was wrong and the judgment erroneous. This record discloses that it was the custom of the trial judge to deliver on each recurring Monday morning during his term of court a charge or lecture to the jury for that week, in which he instructed them, substantially, there should be no hung juries in the trial of causes; that one set of twelve jurymen ought to dispose of a case as easily and as readily as any other twelve jurors. That hung juries were detrimental to the State, were expensive and cost the State money. That causes should be tried without regard to the "standing" of the parties to the litigation, and the jurors should disregard such standing. That they should lay aside all their "contrariness"; and should agree to a verdict. Defendant was not present when this charge was given and had no opportunity then to enter his protest. Many exceptions, however, have been urged and were urged when this matter was called to his attention. This charge was not given on the trial of the case. Had it been, this judgment would have been promptly reversed. I believe even the majority of this court and the Assistant Attorney General would so concede. Two of the jurors thus charged sat upon the trial of the case and convicted appellant. It is a matter of judicial knowledge to this court that it is and has been the habit and custom of that trial judge to so charge the jury. Reed v. State, 74 Texas Crim. Rep., 242, 168 S. W. Rep., 541. The Reed case was tried in the same county by the same judge as was this case, but at a previous term of the court. The Assistant Attorney General recommended a decided approval of this charge by this court. A majority of this court adopted that request as evidenced by their opinion. Partisanship is commendable on the part of attorneys. An attorney's view usually is, that his side is right, but the court does not primarily so hold. The case must so present itself from careful revision. Such request, if indulged, should be of a character that the court, from every standpoint, could say the request should be endorsed as correct and as the law of that case. Zeal is commendable, but this belongs to attorneys, not the court. He may be commended for his success, but I can not agree with the court in adopting his zealous views.

The accused is accorded and entitled to a fair trial by an impartial jury. At least, the Constitution and our law so guarantee. This is time honored, it is the growth of our jurisprudence, and guaranteed by section 10 of the Bill of Rights. This means twelve impartial jurors in the District Court. Article 1, section 10, of the Bill of Rights. Also article 5, section 13, Bill of Rights. This remains inviolate. Constitution, article 1, sections 15 and 29. Each of the twelve jurors shall be fair. It does not mean a part of the jury of twelve, but it means all and each juror. The verdict must be from twelve unbiased jurors. It does not mean a fraction of the jury. The verdict is the independent vote and verdict of each juror. This is guaranteed by the Constitution, and it is provided by the Constitution and the statute that the accused

can not be deprived of such trial. The verdict is not that of a majority of the jury; it must speak the truth as to the conscience and judgment of each juror. There is no warrant of law for the proposition that less than a full jury of twelve men can under any circumstances in a felony case render a verdict, or that the verdict shall be rendered by a majority of the jury. It is not the law that the majority shall control the minority or dictate their verdict. Nor am I aware as to which part of the jury—the majority or the minority—constitute the "contrary jurors," where the jury does not agree. The trial court, however, from his charge, seems to have thought it was the minority. This may be or it may not be, but it is not the province of the judge to decide that question. The law takes this *from the court* and places it *exclusively in the hands of the jury.* There is no rule of law that fixes infallibility in a majority of the jury. Each juror must decide for himself upon his judgment and conscience, and to test this the statute authorizes that the jury *may be polled to ascertain if the verdict is that of each juror unbiasly given.* If not, the verdict is not to be received. The forcing of a majority verdict upon the minority for any reason is violative of every principle of law and is subversive of all ideas of a fair trial and overturns the constitutional and statutory guarantees. The jury could not be fair under such circumstances, nor could it be impartial. If the charge mentioned had been given on the trial of the case, no citizen of Texas, be he layman, attorney or court, would have sanctioned it. It subversively struck at the very basis of a fair trial by an impartial jury, and invaded the province of the jury. No appellate court would have sustained a conviction thus obtained.

Nor does our Constitution, statutes or jurisprudence proceed on the idea that the life, liberty or property of a citizen shall be taken because it may be costly to the State for the jury to disagree as to their verdict, or that a conviction should be upheld obtained for that reason. This idea is more than a criticism and reflection upon our people and their ordained government. The life, liberty and property of our citizenship are not held on or by such sordid considerations. Life, liberty and property are placed on higher lines and grander planes. We have not placed nor rested these great principles on financial consideration. Life, liberty and property are not the subject of cost bills. Innocence is not to be weighed by such methods or means, and it is to be hoped will never be. The Bill of Rights fixes it definitely and provides that no man's life, liberty or property shall be taken except by due process of law. It excludes the idea that either shall be taken to prevent cost or expense. Every criminal trial involves cost and expense, but this has not heretofore been urged as a reason for verdicts or convictions. If this is to be the law, or regarded as such, our lives, liberty and property will become the subject not only of financial consideration but to be decided to save expense accounts. I protest against such propositions either as law or policy. Law and not money is the legal criterion in the trial of cases.

Again the "standing or parties" in criminal cases has heretofore

been considered of most material consideration.   One of the basic prin-
ciples of this and other right-minded governments is the "standing"
and character of the citizenship.   Such "standing" and character has
at all times been considered of inestimable value in governmental and
social relations.   In criminal cases this has been the subject of express
legislation.   In murder cases, as in other cases, the standing and char-
acter of the citizen when tried for his life or liberty has been thought
heretofore to be of the most material consideration.   It is deemed un-
necessary to collate the statutes and decisions manifesting this great
truth and principle.   The books teem with such jurisprudence and
beyond dispute even by the most strenuous seeker for the punishment
of the citizen.   It aids and is in accord with the great underlying
principles of innocence and its overruling presumption.   This belongs
only to the jury to be weighed by them.   It is expressly so provided by
statute.   The court is debarred from passing on such facts.   He in-
structs as to the law; he may not and can not invade the jury box.
Sanctity against the judge guards the jury box and protects the citizen-
ship against his expression of opinion on the evidence.

Character is but a synonym of the high "standing" of the woman-
hood and manhood of our country, and its citizenship for integrity.
It is the product or intended so to be of our civilization, political and
religious, and has been in our history and social life.   Purity of life
has been endorsed among all right thinking people in all times of his-
tory.   On the plains and among the Judean hills Christ denounced the
Pharisee and pronounced benedictions upon purity in life.   To this end
and for the establishment of character, the clergy, Protestant and Cath-
olic, have preached the teachings of the Savior and beginning at Jeru-
salem have heralded the principles of the Sermon on the Mount to all
nations for over 1900 years.   The churches or denominations have
established and supported colleges and universities so that character
lofty and pure might form the basis of society, and from their view-
point inculcate the great doctrines of Christianity.   To the end that
our people be taught high standards of life and character our secular
school systems have been created, fostered, supported and cherished.
Our system of public education, common schools, normal colleges,
A. and M., and State University crystallizes the thought in which is
involved and about which revolves the great central idea of upbuilding
character in our youth and as the basis and hope of the future of our
civilization.   In that great system inheres the welfare, development and
character building of the youth, future manhood and womanhood, and
the higher destiny of our great commonwealth.   The past and present
furnish the greatest and most perplexing problems which have involved
and do involve the destiny of our people and the great issues of the
future.   To meet that and build character of student bodies, those
institutions are endowed and upheld as the central thought of our
civilization and polity, and this whether the school system be sectarian
or non-sectarian, religious or secular.   Higher civilization based on
nobility of character is in the last analysis the central thought of our

advanced and advancing humanity, civilization and jurisprudence. It involves the higher destiny of our country and people.

The trial judge who delivered the derelict charge set out in this record but for the fact of his high character could not have entered the legal profession through which he is permitted to qualify for the distinguished judicial position he occupies and which enabled him to deliver that charge to the jury. That judge selected the jury commissioners by whom the jury he addressed was drawn because of their high "standing" as citizens. The jury he was addressing were chosen on the theory of their character and standing, probity and integrity and fitness to decide the great questions of life, liberty and property submitted to them. The very basic reason for their selection as jurors they were instructed to disregard in deciding upon the lives and liberty of their fellow man. Presumption of innocence is based on the natural as is the legal idea that the citizenship are not criminals, at least to the extent that the prosecution must prove beyond a reasonable doubt the accused guilty of a legal violation. Standing and character is the underlying thought of this fundamental principle of law and government. This charge of the trial judge strikes essentially at the very life of that great principle, and means, if carried out, its destruction.

Character is worth something in all phases and departments of life. It is a priceless asset not only to the individual but to society, civilization and humanity. It is on this principle that humanity moves, works, builds, and this from the mother's touch in infancy at the home fireside till the close of eventful life.

Under our supposedly advancing civilization towards higher planes, loftier thoughts and purer character I am persuaded we have not yet reached the point where character shall be ignored or be levelled with viciousness; or where the good and the noble are to be classed on equality with the impure, or the manhood and womanhood of "standing" and character with those who have neither.

Our Constitution, statutes, jurisprudence, history, polity, civilization, institutions, State and church, in all things and from every standpoint have been based upon the "standing" and character of the womanhood and manhood of our age and country, past and present, and upon these we are building the expectancies of the future of humanity. These all stand as enlarging monuments of protest to the submarine sentiment expressed in the unfortunate charge.

To this end the suspended sentence law was enacted. That law left that matter exclusively to the decision of the jury. The court is powerless to interfere with it. The very basis of the suspended sentence law is the standing and character of the accused, and yet the court said to the jury they must not consider his standing, in face of the fact that appellant filed his plea for suspended sentence in this very case, but the jury failed to recommend it. What effect did the judge's speech or charge have upon this feature of the case? That is one of the questions. Can we tell? We know that the jury refused to suspend the sentence, and we further know that appellant was awarded the highest

punishment allowed by law for the offense of which ne was convicted. It may be this charge from the "Lord's anointed" turned the scale against the defendant, and doubtless did, and caused the jury to resolve all issues against him.

The wife of appellant was placed upon the stand, and testified for her husband, to the insulting conduct on the part of the deceased toward her, and further, that deceased had had carnal intercourse with her, and that he had accomplished this by hypnotizing her, and that she communicated these facts to the defendant prior to the homicide. After she had so testified, the State, upon cross-examination, asked the following question: "Isn't it a fact that your husband, the defendant, W. I. Tyrone, had you to place your hand—one hand on the Bible and one hand on your heart and say that there had never been anything wrong between yourself and Dr. Evers?" Evers was the deceased. Various objections were urged to this; that she was the wife of defendant, and could not be cross-examined on any matter about which she did not testify in her direct examination, and because it was an effort on the part of the State to introduce a privileged communication or conversation between husband and wife. Appellant also asked the court to instruct the jury not to consider this for any purpose. The court qualifies this bill by stating such question was proper examination of the matters elicited by the defendant. The writer agrees with the appellant in this contention. This was privileged matter which is held sacred by the statute.

It does seem to me that this record manifests the fact that the appellant has not had a fair trial such as the law guarantees to the citizen when tried for his life and liberty. If the rule of substantial justice is to be invoked for the State and made the criterion of decision against the citizen, why would not a failure of substantial justice be equally invoked in behalf of the citizen as to his right for fair and just trial? The rule ought to be made to work both ways, if used in criminal trials, and not used to deprive the citizen of a fair trial.

For the reasons indicated the judgment ought to be reversed and the cause remanded.